UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br> v. <br> **BRIAN FEDERICO AND KEVIN LANEY**, <br> Defendants. | Case No.  12-cr-00862-YGR-2 <br> Case No.  12-cr-00862-YGR-3 <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This case stems from an elaborate scheme to obtain money from a victim general contractor through the collusive efforts of the victim's employees and the employees of one of its subcontractors.  The defendants on trial, that is, the general contractor's project manager, on the one hand, and one of the subcontractor's managers, on the other, hid from victim general contractor Matrix Service Company ("Matrix") that they and other co-defendants had created a web of bogus corporations to funnel monies paid from Matrix contracts to their own bogus corporations.  Upon detection, Matrix reimbursed its own customers over $1.3 million, representing those amounts tainted by the self-dealings in which the defendants knowingly, and intentionally, engaged.

The underlying Indictment in this case charged five alleged co-conspirators.  Two defendants, Brian Federico and Kevin Laney, maintained their innocence, waived their right to a jury, and submitted to a bench trial.  The other three pled guilty and testified at trial.  The Court presided over the eleven-day bench trial, beginning on June 8, 2015 and concluding on June 24, 2015, in which the following counts were considered:  both defendants were charged with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 in Count One and with

substantive counts of committing mail fraud in violation of 18 U.S.C. § 1341. The government alleged one substantive count against defendant Laney (Count Two) and four substantive counts against defendant Federico (Counts Two through Five).

Having heard and carefully considered all of the evidence and argument presented at trial, and all briefings and stipulations, the Court hereby renders the following findings of fact and conclusions of law, resulting in its finding of: **GUILTY** as to Counts One and Two as against both defendants Federico and Laney; **GUILTY** as to Count Three as against defendant Federico; and **NOT GUILTY** as to Counts Four and Five (both arising from the same transaction) as against defendant Federico.

## I. FINDINGS OF FACT

### A. Overview

As a preliminary matter, the Court notes that this trial involved an extensive paper trail of invoices, checks, bank statements, and corporation documents, to name a few of the myriad sources of evidence. The parties agreed on numerous factual and documentary stipulations to reduce the length of the trial. The Court accepted those stipulations, including as to the admission of trial exhibits. (*See* Dkt. Nos. 121, 126, 142, 161, 166, 176.)

The defendants generally admit the existence and content of the underlying documents and the lion's share of the government's evidence. The dispute arises from the meanings ascribed thereto in connection with the alleged scheme. The defendants testified and argued that they lacked any intent to defraud Matrix, the general contractor. They claim instead that defendant Federico, who worked for the subcontractor at issue, Imperial Shotcrete, Inc. ("Imperial"), had an oral agreement with one of its owners, Miguel Ibarria, to share profits. Essentially, Federico claimed to be a fifty percent silent partner. According to Federico, the scheme's purpose was not to defraud Matrix, but rather to engage in self-help for the return of money due to him for past profits not shared. Defendant Laney, a Matrix senior project manager, claimed he was just doing his friend, Federico, a favor to help him "collect," but believed some kind of fee for assisting was appropriate. The "fee" to Laney began at ten percent and increased over time. Both defendants argued that because Imperial actually did work for Matrix at, purportedly, "fair market value,"

2

Matrix suffered no loss and therefore was not deprived of money or property under the law. They further argue that the timing and amounts of transactions reflected in the documents corroborate the same.

As set forth more specifically below, the Court finds both defendants not credible with respect to most of the specifics of their testimony, and further finds their tortured justification to be unsupported by law. Reduced to its essence, the entire scheme hinged on Matrix's payments—payments which were made under the cover of explicit and intentional deception by the defendants. The fact that the motivations for engaging in this elaborate scheme may have varied amongst the defendants does not transform the existence or nature of the deception, which lured Matrix to make payments while concealing from it that its own senior project manager, Laney, had pocketed $412,000 and that co-conspirator Federico banked $875,000. Extended to its logical extreme, defendants would have the country's markets reshaped to sanction under-the-table side deals, vigilante justice, and corporate facades created for the sole purpose of facilitating self-gain at the expense of one's employer. While our markets may not be perfect, to claim that our criminal laws sanction such conduct strains credulity.

**B. Findings Regarding Investigation and Structure**

Matrix constructs new tanks and provides tank maintenance and repair services to petro-chemical companies. In 2010, Matrix discovered suspicious billing by a project manager, Charles Burnette, in its Suisun City, California office. Upon investigation, Matrix discovered a scheme showing downstream payments to other Matrix project managers from the Suisun City office through subcontractor Imperial. During the subsequent vendor audit of Imperial, Matrix discovered additional suspicious invoices from Matrix project managers in the Suisun City office to Imperial on projects often managed by the same Matrix project managers.

Matrix project managers were expressly forbidden by the company's code of conduct and business ethics from working for or receiving a benefit from subcontractors they engaged to work on Matrix projects. (*See* Ex. 40.) Imperial itself was generally precluded by its subcontract agreements with Matrix from offering gifts, payments, or other gratuities in order to influence the award of a contract or obtain favorable treatment under a contract. (*See, e.g.*, Ex. 45 and 1001n.)

3

1  Both Federico and Laney knew of these requirements.  While the business relationship between
2  project managers and subcontractors may include some measure of entertainment, such as fishing
3  trips, where such entertainment is offered in a manner transparent to the company, and does not
4  involve any *quid pro quo*, it cannot be said to constitute a kickback.

5  The vendor audit of Imperial uncovered bogus invoices submitted to Imperial by so-called
6  companies named "Rogue Consultants," "Hourmouzus & Sons," "Burnette Engineering
7  Resources," and "APL."  Each of the "entities" were, in fact, bogus companies used to facilitate
8  the co-conspirators' scheme.  Defendant and Senior Project Manager Kevin Laney created Rogue
9  Consultants.  Defendant and Project Manager Brandon Hourmouzus created Hourmouzus & Sons.
10  Defendant and Project Manager Charles Burnette created Burnette Engineering Resources.
11  Defendant Federico of Imperial created APL and CEMS, which he used when dealing with Project
12  Manager Mark Zembrycki.  The bogus invoices submitted by the Matrix project managers from
13  these bogus companies referenced items such as annular plates, sumps, nozzles, and sprayers.
14  These are all items Matrix fabricates on its own, and Matrix would not use a concrete company to
15  supply these items.  The defendants did not reveal or advise Matrix of the existence of any of these
16  companies, nor their purpose.

### C. Flow of Money From Matrix

18  Imperial Defendants Federico and Ibarria and Matrix Defendants Laney, Hourmouzus, and
19  Burnette all testified at trial and confirmed their respective invoices and the corresponding
20  amounts.  With respect to the downstream money flow, none of these details are in dispute.  After
21  discovering the fraud, Matrix reimbursed its clients for all of the money its project managers
22  invoiced Imperial, over $1.3 million.  (*See* Ex. 47.)  While denying any intent to defraud, during
23  trial both defendants admitted that the money the Matrix project managers received from Imperial
24  with their bogus invoices ultimately came from Matrix.  (Trial Tr. 1957:22-1958:23; 1712:14-20.)
25  The Court finds that in order for the money to have flowed downstream, the scheme required
26  Matrix to make payments as follows:

27  From February to October 2007, Rogue Consultants submitted 16 invoices for $1,010,503
28  related to Matrix projects, and Imperial paid them.  (*See* Exs. 71, 73.)  Federico submitted 4

1  CEMS invoices to Rogue for $878,086 from April to December 2007.  (*See* Ex. 71.)  But, from

2  April 2007 to July 2008, Rogue paid Federico through CEMS only $598,441.  (*See id*.)  The

3  invoices were linked to Matrix contract invoices totaling $1,483,091, which Matrix paid.  (*See*

4  Exs. 71, 73.)

5  From February to July 2008, APL submitted 7 invoices for $159,750 related to Matrix

6  projects, and Imperial paid them.  (*See* Exs. 71, 73.)  The invoices were linked to Matrix contract

7  invoices totaling $266,210, which Matrix paid.  (*See id*.)  In March 2008, Imperial paid an APL

8  invoice for $23,750 to Zembrycki with APL and Chevron Tank 3129 in Richmond referenced in

9  the memo.  (*See* Exs. 71, 540.)  Also, in March 2008, Federico paid $5,000 to Zembrycki.  (*See*

10  Exs. 71, 740a.)  In exchange for these two payments, Zembrycki gave Federico a Ford Excursion.

11  No evidence was provided regarding the value of the vehicle.  In May 2008, Imperial paid APL

12  invoices totaling $68,000 to U.S. Bank.  Federico received these funds and made payments against

13  the Home Equity Line of Credit ("HELOC") for Rita Morris, Federico's mother-in-law.  (*See* Exs.

14  71, 741a-c.)  In June 2008, Federico wrote a check to Zembrycki for $2,000, referencing

15  "materials reimbursement."  (*See* Exs. 71 and 740f.)  In August 2008, Imperial again paid APL

16  invoices totaling $68,000 to U.S. Bank.  (*See* Exs. 71, 542a-c.)  Federico received these funds and

17  deposited them into his bank accounts.  (*See* Exs. 742a-c.)  The APL invoices used were not

18  authentic APL invoices.

19  From January to October 2008, Hourmouzus & Sons submitted 6 invoices for $119,150

20  related to Matrix projects, and Imperial paid them.  (*See* Exs. 71, 73.)  The invoices were linked to

21  Matrix contract invoices, totaling $196,460, which Matrix paid.  (*See id*.)  From March to

22  December 2008, Imperial paid invoices from Hourmouzus & Sons, totaling $119,150.  In March

23  2008, Hourmouzus received a check for $28,650 from Imperial, and he deposited it into his bank

24  account.  (*See* Exs. 71, 521.)  At Federico's direction, Hourmouzus wrote a blank check for

25  $13,650 and gave it to Federico, who made it out to his neighbor who had done some work for

26  him.  (*See* Ex. 720.)  In August 2008, Hourmouzus received a check for $30,000 from Imperial,

27  and he deposited it into his bank account.  (*See* Exs. 71, 520.)  The next month, Hourmouzus

28  wrote a check to Federico for $10,000 and paid off a Chevy Envoy and Ford F-150 truck, which

Hourmouzus delivered to Federico. (*See* Exs. 722-23.) In December 2008, Imperial issued two checks to Hourmouzus & Sons totaling $60,500, which were used to pay Federico's mortgage with Wells Fargo Bank. (*See* Exs. 71, 522a-c.)

From March to May 2010, Burnette Engineering Resources submitted 3 invoices for $90,069 related to Matrix projects, and Imperial paid them. (*See* Exs. 71, 73.) The invoices were linked to Matrix contract invoices totaling $145,149, which Matrix paid. (*See id*.)

Ibarria was generally aware of the invoices in question. He confirmed they were kickbacks to project managers in exchange for receiving favorable Matrix contracts.

Had Matrix known of the defendants' scheme, it would not have made any of the payments associated with the scheme.

**D. Other Relevant Facts**

First, with respect to the business dispute between Ibarria and Federico, both testified that an oral agreement did exist to share profits, although the details were never reduced to writing. Imperial paid both the same salary and purchased similar Hummers for each of them, although no profits were distributed, much less shared.

Second, Matrix project managers are given considerable discretion to manage projects. Additionally, during the relevant time period, the price of oil was high, resulting in a high demand for work and decreased oversight.

**II. CONCLUSIONS OF LAW**

**A. Applicable Legal Framework**

With respect to each substantive count of mail fraud, the elements under 18 U.S.C. § 1341[1]

---

[1] The relevant portion of the statute provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be

1   are: (1) proof of a scheme to defraud; (2) using or causing the use of the mails to further the
2   fraudulent scheme; and (3) specific intent to defraud. *United States v. Bonallo,* 858 F.2d 1427,
3   1433 (9th Cir. 1988); *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Under this
4   section, fraud refers to "(1) a false representation (2) in reference to a material fact (3) made with
5   knowledge of its falsity (4) and with intent to deceive (5) with action taken in reliance upon the
6   representation." *Id*. (quoting *United States v. Clevenger,* 733 F.2d 1356, 1358 (9th Cir. 1984)).
7   The mail fraud statute reaches a wide range of fraudulent activity. *See, e.g.*, *McNally v. United
8   States,* 483 U.S. 350 (1987) (mail fraud statute has been characterized as the "'first line of
9   defense' against virtually every new area of fraud to develop in the United States in the past
10  century") (quoting Jed Rakoff, *The Federal Mail Fraud Statute,* 18 Duquesne L. Rev. 771, 772-73
11  (1980)). The statute applies to schemes involving money or property. *See McNally,* 483 U.S. at
12  355-61.

13  In *McNally*, the Supreme Court made clear that "the words 'to defraud' commonly refer 'to
14  wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the
15  deprivation of something of value by trick, deceit, chicane or overreaching.'" 483 U.S. at 358
16  (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188 (1924)). For a mail fraud
17  conviction, "[i]t is enough . . . that the government charge and the jury find either that the victim
18  was actually deprived of money or property *or* that the defendant intended to defraud the victim of
19  the same." *See United States v. Utz,* 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis in original).

20  Thus, the question is whether deception was used to deprive the victim of money or
21  property. "The common understanding of the verb 'to deprive' is to take away something, such as
22  property, from another." *United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 1990) (citing
23  Black's Law Dictionary 473 (8th ed. 2004)) (defining "deprivation" as "[a]n act of taking away").
24  In this regard, and by analogy to a Section 1343 wire fraud case, the defendant's "guilt or
25  innocence of the crime charged is entirely independent of and unrelated to his belief of the

27  fined under this title or imprisoned . . . ."

7

property's value. . . . Because he has conceded that he intentionally created a false statement, it was no defense here for him to argue that he genuinely believed that the property was worth what the [victim] paid for it." *United States v. Oren*, 893 F.2d 1057, 1062 (9th Cir. 1990). The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.

Additionally, with respect to the "mailing" element, it is satisfied if the "government can show that the defendant knew or could reasonably foresee that the mail would be used in the ordinary course of business." *United States v. Montgomery*, 384 F.3d 1050, 1063 (9th Cir. 2004). "In general, to be in furtherance of a scheme, the charged mailing or wire transmission need not be an essential element of the scheme, just a step in the plot." *Id.* (quoting *United States v. Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004)).

Finally, as to the conspiracy counts, 18 U.S.C. § 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." In order to establish conspiracy, the government must prove a defendant "knew of and willfully joined in the unlawful scheme to defraud; circumstantial evidence can supply proof of knowledge of the scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). "[A] federal conspiracy conviction does not require a greater level of criminal intent than a conviction on the substantive count." *United States v. Hubbard*, 96 F.3d 1223, 1229 (9th Cir. 1996).

**B. Conclusions as to Each Count**

As a threshold matter, the Court addresses the defendants' overarching arguments asserted on each count as to each defendant, namely that while they admit the existence of a scheme, their intent was not to defraud Matrix, but to obtain money from Miguel Ibarria of Imperial. The Court finds that the trial defendants' attempted reconstruction of the scheme to manufacture a defense fails. Put in context, project managers had considerable independence and discretion to award

8

1  contracts under a strict set of ethical guidelines to assure the integrity of the process.  The
2  defendants set those aside for their own personal gain, proving what co-conspirator Miguel Ibarria
3  boasted to Charles Burnette:  "When it rains, we all get wet."  (Trial Tr. 1040:16.)

4  *United States v. Bonallo,* 858 F.2d 1427 (9th Cir. 1988), is instructive.  There, a bank
5  employee was convicted of bank fraud for making automatic teller withdrawals and then altering
6  the computer records so that the withdrawals would be charged to the accounts of other customers
7  rather than his own account.  *See id.* at 1429-32.  One of Bonallo's arguments on appeal was that,
8  while the government charged that it was the bank that was deceived, his intent was to obtain
9  money from bank customers themselves, not the bank.  *Id.* at 1434 n.9.  The court held that
10 because banks reimburse the accounts of customers who are wrongly charged, Bonallo effectively
11 harmed the bank when he altered the records.  *Id.*  Thus, the element of intent to obtain money or
12 property from the victim of the deceit was satisfied.

13 The trial defendants similarly argue that they did not intend to harm Matrix.  The Court
14 disagrees.  Not only would the Court have to accept defendants' self-serving testimony, but even
15 giving it a modicum of credence, the defendants' scheme, *by definition*, required the flow of
16 money from Matrix specifically.  No other general contractor would do.  As a consequence, the
17 reality of Matrix's role as the intended victim illumines.  All defendants knew that the Matrix
18 project managers were not allowed to receive "personal benefits as a result of [their] position in
19 Matrix" or to "work simultaneously (whether as an employee or consultant) for a . . . supplier of
20 Matrix" and that they could not disclose "non-public information" to a supplier.  (Ex. 40, ¶¶ 6 and
21 7.)  The duty extended to subcontractors, including Imperial, as the standard form of agreement
22 required them to:

> refrain from offering or giving to an officer, official or employee of Contractor or Owner, gifts, entertainment, payments, loans or other gratuities to influence the award of a contract or obtain favorable treatment under a contract.

25 (Exs. 1001n; 45.)  The obvious and logical reason for the rule was that the bidding process,
26 especially with sole-source contracts, required fair dealing and arm's lengths negotiations.  The
27 entire fabric of that process disintegrates when the individuals negotiating have agreed in advance
28 to share, downstream, the monies flowing from the approved contracts.

9

The evidence confirms undisputedly that the scheme could not work, nor was it designed to work, with the flow of money from any general contractor *other than Matrix* despite the fact that Imperial worked with several. It did not, and could not, because the flow of money was premised on the fact that Matrix's project managers were approving the invoices, and as a *quid pro quo*, knew that they would receive a benefit in return. In the case of defendant Laney, his negotiated payback began at ten percent and increased from there.

The argument that Matrix was not defrauded because it may have received "market value" by way of the project work is a red herring. Matrix was entitled to, and defrauded of, "fair market value" for each of the contracts where monies flowed downstream to the defendants. In this industry, fair market value admittedly involves a range. A trier of fact need not determine whether the precise price of the project should have differed by $100 or $10,000. The defendants repeatedly, and blindly, ignore the term "fair" in their positioning. The precise amount is not determinative. "Fair market value" has been defined as the "amount at which the property would change hands between a willing buyer and willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, **both parties having reasonable knowledge of relevant facts**." *See* Rev. Rul. 59-60, 1959-1 C.B. 237 (emphasis supplied). Here, relevant facts were intentionally hidden from Matrix, most importantly the entire structure of the downstream scheme of payments to project managers and the secretive motivation to award contracts to Imperial so that kickbacks could be paid. Had Matrix been advised of these relevant facts, Matrix would never have paid the amounts to Imperial in the first instance. Period. In fact, it is most assuredly the case that it would not have even paid *below* market rates under such tainted circumstances, proving the precise amount of the subcontract is not dispositive. On this critical distinction, the defendants stand silent. On this critical marker, their house of cards falls.

Having rejected the defendants' creative defense, and deeming the defendants themselves to be not credible, untrustworthy, and unreliable as far as their self-serving trial testimony,[2] the

---

[2] Numerous examples exist of the defendants' falsifications and their testimonial inconsistencies and contradictions. Most remarkable, it is inconceivable that a seasoned project

10

balance of the government's case—which meticulously proves a flow of money from Matrix contracts to the defendants—is relatively unchallenged.[3] The Court summarizes its conclusions as to each below, including additional facts not previously mentioned:[4]

### 1. Count One (Defendants Federico and Laney)

Count One concerns conspiracy to commit mail fraud. The Court finds that the government has proved each element of this count. Amongst the evidence proving this Count, the Court reviews two particular transactions in the scheme:

First, the government proved that in the Spring of 2007, Federico submitted false invoices to Matrix for $207,003, approved by Project Manager Laney and which Matrix paid. Laney, through Rogue Consulting, then invoiced Imperial for $188,184.53, which was paid and then split between the co-conspirators. Thus, Imperial kept $18,818.47. Laney, who had initially received $188,184.53, kept $50,184.53 for himself and sent the balance of $138,000 to Federico's bogus corporation, CEMS.

Second, co-conspirator Brandon Hourmouzus confirmed that he would find projects that he thought would not be scrutinized or "raise red flags," so that the scheme for padding and

---

manager would agree to "help" a friend with such an elaborate plan not knowing any of the details of the alleged debt. One day it was described as a debt of $500,000, then after lunch the amount changed to over $1 million, with the kickbacks/fees referred to as a "loan." Similarly, defendant Federico floundered as he unsuccessfully attempted to classify the payments to Laney as legitimate rather than a classic example of a "kickback." Almost as incredulous was defendant Laney's claim that he named "Rogue Consulting" after a river, while later acknowledging that his brother had created a similar bogus company, named "UT Radar" for "Under the Radar," and stating that he did not want his brother to follow the same path with Federico that he had. Laney created a company called Western States Consulting, related to an agreement with Robert Robles, a subcontractor of Matrix. Under the agreement between Robles and Laney, Robles paid Laney about $100,000 while Laney was an employee at Matrix. (*See* Ex. 72.)

[3] Given the strength of the government's case-in-chief, as set forth herein, even irrespective of any evidence presented after the close of the government's case-in-chief, the Court finds no merit in the defendants' Rule 29 motion, which it hereby **DENIES**.

[4] As a preliminary matter, the Court notes that the "mail" element is satisfied. The defendants stipulate to the fact of certain checks being mailed from Matrix in Tulsa, Oklahoma to Imperial in Livermore, California. (Dkt No. 161) In light of the close connection between those payments and the overall scheme, the Court finds this element readily established as to all counts of mail fraud. As noted herein, without the payments by Matrix to Imperial, which were in turn used to pay the kickbacks, the scheme would have failed. As to the conspiracy count, it was reasonably foreseeable from the outset that the scheme would involve use of interstate mail.

11

payouts would not be detected, given his knowledge of the budget. With this information, and in furtherance of the scheme, he provided that information to Imperial in circuitous ways by revealing that there was "more room." More specifically, with respect to a sole-source contract with Chevron for a tank in Tucson, Arizona, Hourmouzus approved Imperial as the subcontractor—although it does not appear to have an Arizona license—and then approved the invoiced amount of $48,650. Notably, Imperial was the only subcontractor on that job who submitted an invoice *to the penny* of Matrix's internal budgeted amount. Federico inaccurately invoiced Matrix for "Premium time" for "labor" or "on concrete" where no such premium existed and for "plant charges after hours," again, a falsity. The total invoice charged Matrix $48,650. Matrix paid. Flowing downstream from the Matrix funds, Hourmouzus received $15,000 and Federico received almost an equal amount of $13,650 (which he directed to be paid to someone else to whom he owed money).

Consistent with Hourmouzus's testimony, Laney too admitted that he identified the jobs where padding the invoice was ideal: those that were expensive, long in duration, or that otherwise had a major change. Importantly, the Court acknowledges that budgeting can be a relatively fluid process in this industry. Accordingly, the defendants' claim that the "timing" reflected in the documents disproves the scheme does not persuade. The lack of perfection in timing, given the fluidity of the scheme, does not undermine the existence or operation of the scheme. To the contrary, in many ways it merely enhanced the co-conspirators' ability to keep the scheme hidden. While, at times, the evidence shows a linear flow of documents and money, schemes to defraud are as common when formed as webs rather than as straight lines. It is, in fact, the former that is more insidious and more difficult to uncover. *See Bonallo*, 858 F.2d at 1433 ("Not surprisingly, we have found no cases suggesting that the misrepresentation must actually precede the transfer of money or property to the perpetrator in order to violate the mail fraud statute. Such a timing requirement would contradict the broad reading afforded its provisions. All that is necessary is the existence of a knowing and material misrepresentation designed to deceive, specific intent, and use of the mails or wires in furtherance of the scheme.").

### 2. Count Two (Defendants Federico and Laney)

Count Two concerns a substantive count of mail fraud relating specifically to the work performed on the tanks in McKittrick, California. The Court finds that the government has proved each element of this count. Amongst the evidence proving this Count, Matrix Project Manager Khory Sands testified credibly that the negotiated amount of $45,000 per tank seemed high and that he received the project mid-way through the budgeting process. He further confirmed that Federico had already been chosen as the concrete subcontractor and that the project was a "hand off" under the supervision of senior project manager, Kevin Laney. Directly flowing from this project award, Matrix paid Imperial $90,000, of which Laney invoiced Imperial $70,000, retaining for himself ten percent, or $7,000, and sending Federico the balance of $63,000.

Federico's testimony on this project again shows the internal contradiction with the defense proffered at trial. On the one hand, he testified that he told the client representative $45,000 per tank was not enough to do the work because of costs associated with overhead and travel, not just labor and supplies. On the other hand, he pocketed $63,000 himself, despite not having any such overhead and travel costs, as those were borne by Imperial, not Federico. The claim that $45,000 was not sufficient for one tank does not persuade.

### 3. Count Three (Defendant Federico)

Count Three concerns a substantive count of mail fraud relating specifically to the work performed on the tanks in Eureka, California. The Court finds that the government has proved each element of this count. Amongst the evidence proving this Count, Hourmouzus testified as to his role with Federico in executing the scheme. Consistent with Hourmouzus' testimony, records confirm that Imperial billed, and Matrix paid, an amount inflated to be *just $55.00 under* the supposedly confidential budget number of $47,000; a difference of a mere *0.12 percent*. Federico would have the Court believe that this figure was the result of fair negotiations where no other subcontractor enjoyed such clairvoyance.

Here, Matrix paid Imperial $46,645.00. Hourmouzus & Sons issued, and Imperial paid, three bogus invoices totaling $30,000. Thereafter, Hourmouzus deposited a check in Federico's account for $10,000 and then paid off the balance of two vehicles which he also gave to Federico.

### 4. Counts Four and Five (Defendant Federico)

Counts Four and Five concern substantive counts of mail fraud relating specifically to the work performed on the Plains All-American tanks in Martinez, California. With respect to this Count, the Court finds that the government has not met its heavy burden. The government has failed either to tie the scheme sufficiently to Matrix Project Manager Mark Zembrycki (who is not charged as a co-conspirator) or to show that Federico separately engaged in conduct designed to defraud Matrix through material misrepresentations during his interactions with Zembrycki.

The evidence presented at trial revealed that the scheme was executed through some, but not all, projects for which Imperial did work for Matrix. Unlike the other co-conspirators, no evidence exists that Zembrycki formed a bogus corporation to funnel kickbacks. Further, without more, the exchange of money for a vehicle or a single check for $2,000 for "materials reimbursement" is insufficient to satisfy the burden required for a conviction. No witness has implicated Zembrycki. The amount invoiced, which admittedly is in excess of hard costs, standing alone is insufficient to prove mail fraud as to Matrix specifically. Moreover, the amount invoiced was not within a mere fraction of the budgeted amount which would have evidenced, circumstantially, the ongoing scheme to defraud. Nor did the government proffer a forensic analysis comparing this project amount to those for which no fraud was found to show a continuing pattern here. The delta between the budgeted amount and the invoiced amount was approximately nine percent, which is within a reasonable range according to the testimony.

## III. CONCLUSION

For the foregoing reasons, and on the Indictment issued, the Court **FINDS** defendant Kevin Laney **GUILTY** on Counts One and Two and **FINDS** defendant Brian Federico **GUILTY** on Counts One, Two, and Three and **NOT GUILTY** on Counts Four and Five.

**IT IS SO ORDERED.**

Dated: July 23, 2015

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**